IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| AMY MILLS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-07-891-D |
| ) | |
| STATE OF OKLAHOMA *ex rel.* ) | |
| DEPARTMENT OF CORRECTIONS, ) | |
| ) | |
| Defendant. ) | |

## **O R D E R**

Before the Court is the Motion for Summary Judgment of Defendant State of Oklahoma *ex rel.* Department of Corrections ("DOC"). Defendant seeks a judgment as a matter of law pursuant to Fed. R. Civ. P. 56 on all claims brought by Plaintiff Amy Mills under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.*, and state law. Plaintiff has timely opposed the motion, and the parties have filed supplemental briefs regarding recent decisions of the Oklahoma Supreme Court.

**A.      Standard of Decision**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id*. at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id*. If a party who would bear the

burden of proof at trial lacks sufficient evidence on an essential element of a claim, all other factual issues concerning the claim become immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex*, 477 U.S. at 322-23. If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); Fed. R. Civ. P. 56(e)(2). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671. Although a district court has discretion to go beyond referenced portions of the supporting material, it is not required to do so. *Id.* at 672. The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### B. Statement of Material Facts[1]

Plaintiff, a Caucasian female, was employed by DOC as a correctional officer at the Lexington Assessment and Reception Center ("LARC") from November, 2005, to August, 2006.[2] Plaintiff's primary duties included controlling access by employees and inmates to the medical floor and the Assessment and Reception Center. One of her direct supervisors was Lieutenant Torrence

---

[1] This statement includes facts presented by Defendant that are supported by the record and are either admitted or not opposed in the manner required by Rule 56, as well as facts presented by Plaintiff with record support. Any stated fact that is not supported by a party's citation to the record is disregarded.

[2] Plaintiff also worked for DOC in this position from February to August, 2002, but voluntarily left for personal reasons. Between her two periods of DOC employment, Plaintiff had several jobs that each lasted for a brief period of time.

2

Roane, an African American male.[3] Plaintiff submitted a notice of her resignation on August 24, 2006. In an EEOC charge filed on August 28, 2006, and in the Complaint in this case, Plaintiff claims she suffered gender and racial discrimination and retaliation during her employment that created a hostile work environment and caused her to resign, constituting a constructive discharge from employment. To support her claims, Plaintiff relies on the following alleged incidents, which are described in the light most favorable to her.

In December, 2005, Sergeant Beau Runnells,[4] a Caucasian male, made derogatory remarks about women in Plaintiff's presence. After a telephone call, Sgt. Runnells slammed down the phone and stated that "women are the anti-Christ," "women, I swear, they should all go to hell" and "women, God damn it, I cannot stand y'all." *See* Pl.'s Corrected Resp. Br., Ex. 19 [Doc. 37-12]. He also directed the following comment at Plaintiff: "I promise you won't have a good time with me today." *Id*. Sgt. Runnells was replaced by another officer within 15-20 minutes, and Plaintiff did not see him the rest of the day. Plaintiff did not make a written complaint about these comments but told an investigation officer, Lieutenant Tom Jones, who said he would talk to Sgt. Runnells about the incident. Plaintiff also later spoke to Captain Davis and Lieutenant Martinez, who asked her to drop the matter. Sgt. Runnells did not say anything else to Plaintiff but "gave [her] the cold shoulder after that." *See* Mills Dep. [Doc. 37-11] at 64:19-25.

Plaintiff claims Lt. Roane engaged in gender discrimination and retaliation against her in May, 2006, in the manner in which he handled a false report by a male inmate that she had used

---

[3] The chain of command is cadet, officer, corporal, sergeant, lieutenant, captain, chief of security, deputy warden, and warden. Lt. Roane was not Plaintiff's direct supervisor after a shift change in July, 2006. *See* Mills Dep. 77:8-23.

[4] The Court adopts the last-name spelling used by Defendant, which also appears in the transcript of Plaintiff's deposition. Plaintiff in her brief spells the name "Runnels."

3

inappropriate, vulgar language while conducting a search of the inmate. She viewed Lt. Roane's investigation of the report against her to be gender-based because Lt. Roane commented that the accusation was more serious because of her gender; she viewed his investigation as retaliatory because Sgt. Runnells, the subject of her prior complaint, was Lt. Roane's friend. According to Plaintiff, Lt. Roane promised to initiate disciplinary action against the inmate for making a false report against a staff member, but took no further action. Plaintiff also alleges Lt. Roane falsely told her in July, 2006, that she was under investigation for providing contraband papers that were found in an inmate's cell. During July or August, 2006, Plaintiff was absent from work on sick leave, but she learned from a coworker that Sergeant Burris, an African American male, was telling other employees Plaintiff was on administrative leave for inappropriate conduct with inmates. When Plaintiff reported this to Lt. Roane, his only response was telling her to "quit being thin-skinned." Mills Dep. 106:23-107:1.

On August 18, 2006, Plaintiff was on duty in the control room for the medical area and refused to admit a male inmate with a cart of medical supplies because female inmates were present in the area. The male inmate was being escorted by Corporal Woods, an African American male. Plaintiff's refusal was based on a post order stating that male and female inmates must be kept separate at all times. Cpl. Woods became upset and yelled at Plaintiff to open the door, using obscenities. Another officer on duty, Sergeant Hadfield, admitted Cpl. Woods and the male inmate to the area while Plaintiff was on the telephone seeking clearance from a senior officer. After being admitted, Cpl. Woods made derogatory comments about Plaintiff, one of which could be considered race-based and gender-based (referring to her as a "white bitch"). Plaintiff submitted an incident report about Cpl. Woods' conduct, and Lt. Roane indicated to Plaintiff that he would handle the matter. Unsatisfied with Lt. Roane's response, Plaintiff submitted to him on August 20, 2006, a

4

written complaint alleging race and gender discrimination.[5] Plaintiff's complaint was assigned to Lieutenant Karleen Hamilton, an African American female, for investigation.

On August 23, 2006, Plaintiff returned to work from a 2-day absence for scheduled days off. Lt. Hamilton met with her that day and notified her of the investigation; Cpl. Woods also received notice of the investigation. Lt. Hamilton initially gave a "cease and desist" order to each person, but she later acknowledged this was a mistake because, as the complainant, Plaintiff should not have received one. By their next meeting on August 24, 2006, Plaintiff had begun to doubt the purpose of the investigation.[6] Lt. Hamilton questioned Plaintiff about her refusal to open the door in a manner that caused Plaintiff to believe that her conduct, rather than the conduct of others, was under scrutiny. Lt. Hamilton also questioned Plaintiff about a report by Lt. Roane that Plaintiff had brought a tape recorder into the facility without authorization. For her part, Plaintiff also went beyond the written complaint to report the allegations against Lt. Roane discussed above.

During the afternoon of August 24, 2006, another incident occurred as a result of Plaintiff's enforcement of the same post order. A case manager, Tracy Jones (a Caucasian male) became upset and yelled at Plaintiff for not allowing a male orderly to walk into an area where Mr. Jones was escorting a female inmate.[7] In addition to raising his voice, Mr. Jones hit the control room door where Plaintiff was located and threatened to get her fired. Plaintiff immediately reported the

---

[5] In her written complaint, Plaintiff requested "that Officer Woods be given a formal written reprimand, as well as counseling on his treatment of officers in general, and female officers specifically." *See* Def.'s Mot., Ex. 3 [Doc. 29-4].

[6] The Court accepts the dates stated by the parties but notes that the record is somewhat unclear on the timing of the investigation. Lt. Hamilton's report states she first met with Plaintiff on August 21, 2006, and interviewed Cpl. Woods on August 22, 2006.

[7] Plaintiff refers to Mr. Jones in her deposition testimony as the unit manager for the Assessment and Reception Center.

5

incident to the chief of security, Major Robert Watson, a Caucasian male. During their discussion, Plaintiff told Maj. Watson that she felt like she was being pushed into resigning in retaliation for her complaints against Cpl. Wood and Lt. Roane. Maj. Watson responded that resignation might not be a bad idea. He also instructed Lt. Hamilton to look into the incident. Within 30 minutes, Lt. Hamilton convened a meeting with Plaintiff that was attended by Captain Cody DeCamp and Lieutenant Eric Emblom (both Caucasian males).[8]

During the meeting, Lt. Hamilton, Capt. DeCamp, and Lt. Emblom all questioned Plaintiff about various issues, some of which were new, in a manner that Plaintiff felt was designed to intimidate her and force her to quit.[9] Lt. Emblom reportedly told Plaintiff that nobody liked her, she could not get along with others, and she was a troublemaker. Capt. DeCamp directed Plaintiff to repeat her complaints against Lt. Roane, and after she related the "quit being thin-skinned" remark, Capt. DeCamp said it sounded like Lt. Roane was just giving her sound advice. Capt. DeCamp also told Plaintiff she was too emotional because she began crying. Lt. Hamilton questioned Plaintiff about the post order in a manner that suggested Plaintiff was misinterpreting the policy. However, Defendant now admits that Plaintiff was correctly enforcing the post order.

Plaintiff alleges that Lt. Hamilton first raised the possibility of a resignation in this August 24 meeting. Lt. Hamilton pushed a legal pad at Plaintiff and told her "go ahead and do your resignation but understand, we're not forcing you." *See* Mills Dep. 104:8-14. Plaintiff says she stated that she felt like she was being forced and Lt. Hamilton did not respond. Plaintiff then wrote a resignation notice in which she stated her reason for leaving was due to a "hostile environment." *See* Pl.'s

---

[8] Lt. Emblom was replacing Lt. Hamilton as the investigation officer and Capt. DeCamp was Plaintiff's superior officer (above the rank of lieutenant).

[9] Lt. Hamilton in her deposition testimony completely denied Plaintiff's account of this meeting.

6

Corrected Resp. Br., Ex. 17 [Doc. 37-10]. During the conversation, Plaintiff allegedly asked Lt. Hamilton about an inmate grievance that had been mentioned during the meeting and then said: "so what's going on here is that you're going to come up with more bogus inmate grievances against me if I don't do this resignation?" *See* Mills Dep. 108:3-5. According to Plaintiff, Lt. Hamilton responded by nodding her head in an affirmative gesture. Plaintiff has also testified that she asked Lt. Hamilton, "so what you're telling me is that I'm not safe here physically and professionally?" and Lt. Hamilton did not respond or reassure Plaintiff that she would be safe, which Plaintiff interpreted as "basically affirming that, yes, you're not going to be safe here." *See* Mills Dep. 149:16-22. Plaintiff felt her physical safety would be jeopardized if she stayed because the inmates had seen that other officers did not support her. Capt. DeCamp accepted Plaintiff's resignation by adding a handwritten note waiving the 2-week notice period due to Plaintiff's "emotional [sic] and feeling of persecution. She would be a detriment to the works of the institution . . . ." *See* Pl's Resp., Ex. 17 [Doc. 37-10].

When Plaintiff began employment with DOC, she attended a training academy and received training on numerous subjects, including sexual harassment and discrimination.[10] DOC had written policies that established rules for employee conduct, progressive discipline, and resolution of employee grievances, and that provided for investigation of allegations of prohibited conduct. The grievance resolution procedure was available to all employees and specifically covered complaints of discrimination and retaliation; it authorized the filing of a form of written grievance with a grievance manager if informal discussion between the employee and the immediate supervisor (or lowest level supervisor with the authority to resolve the issue) did not resolve the dispute.

---

[10] This training occurred each time Plaintiff began DOC employment. *See supra* note 2.

Supervisors were responsible for informing employees of the grievance resolution procedure and the name of the agency grievance manager, and for informally discussing and addressing disputes brought to their attention. Plaintiff denies that Defendant complied with these procedures at LARC. Plaintiff also contends she made numerous reports of discrimination or retaliation that were not addressed according to the policy.

    **C.    Defendant's Motion for Summary Judgment**:

Defendant seeks summary judgment on Plaintiff's Title VII claim on the ground she cannot prove a claim of constructive discharge under the standards of *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), and *Exum v. United States Olympic Comm.*, 389 F.3d 1130 (10th Cir. 2004). Defendant contends Plaintiff lacks proof that unlawful acts made her working conditions intolerable, that her resignation was involuntary under an objective standard, and that she gave LARC officials a reasonable opportunity to address her one written complaint of discrimination, which was submitted only two working days before her resignation.[11] Regarding her state law claim, Defendant contends Plaintiff's evidence also fails to satisfy the standard for proving a constructive discharge under Oklahoma law. *See Collier v. Insignia Fin. Group*, 981 P.2d 321, 323-24 (Okla. 1999).

    **D.    Plaintiff's Title VII Claim**

Plaintiff claims she was subjected to a hostile work environment created by gender-based, race-based, and retaliatory conduct that became intolerable and amounted to a constructive discharge. This constructive discharge claim, like the one in *Suders*, can be regarded as an "aggravated case" of hostile work environment harassment or "a 'worse case' harassment scenario,

---

[11] To the extent Defendant focuses on Plaintiff's alleged failure to mitigate harm by taking advantage of DOC's grievance process and alternatives to resignation, this argument addresses an affirmative defense to liability available under *Suders* when no tangible employment action precipitates the resignation; it is not an element of Plaintiff's constructive discharge claim. *See Suders*, 542 U.S. at 152.

harassment ratcheted up to the breaking point." *Suders*, 542 U.S. at 146, 147-48. "Constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit. A finding of constructive discharge depends upon whether a reasonable person would view the working conditions as intolerable, not upon the subjective view of the employee-claimant." *MacKenzie v. City of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005); *see also Exum*, 389 F.3d at 1135-36; *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007); *Tran v. Trustees of State Colleges*, 355 F.3d 1263, 1270 (10th Cir. 2004) ("we apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent . . . are relevant"). As noted by the Tenth Circuit, a "plaintiff's burden in establishing constructive discharge is substantial" and cannot be met "merely by producing evidence showing that working conditions were difficult or unpleasant" or by presenting "some evidence of discriminatory animus in the workplace." *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980-81 (10th Cir. 2008). Plaintiff must prove that Defendant "through unlawful acts, ma[de] working conditions so intolerable that a reasonable person in [Plaintiff's] position would feel forced to resign." *Exum*, 389 F.3d at 1135.

A hostile work environment that violates Title VII is one involving harassment based on prohibited factors, such as race or gender, that is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "Severity and pervasiveness are evaluated according to the totality of circumstances, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993), considering such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Chavez v. New Mexico*,

9

397 F.3d 826, 832 (10th Cir. 2005). "[T]he environment must be both subjectively and objectively hostile or abusive." *MacKenzie*, 414 F.3d at 1280. The fact-finder must "judge the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007); *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

In this case, Plaintiff lists "eleven (11) acts of discrimination and/or retaliation" that allegedly led her to the breaking point. *See* Pl's Corrected Resp. Br. [Doc. 37] at 8-9.[12] For ease of discussion, the Court groups these enumerated acts into three general categories: Sgt. Runnells' comments about women; Plaintiff's conflicts with Lt. Roane; and the events immediately preceding Plaintiff's resignation in August, 2006.

1. Sgt. Runnells' Comments

Plaintiff enumerates three acts related to Sgt. Runnells' gender-based comments in December, 2005: the comments themselves; the fact that Lt. Jones said he had taken care of the problem but another supervisor, Capt. Davis, was unaware of it; and the fact that Sgt. Runnells thereafter refused to speak to Plaintiff, allegedly in retaliation for her complaint. Viewed most favorably to Plaintiff, the Court assumes these facts could reasonably be viewed as hostile. The incident happened, however, some five months before Plaintiff encountered any problem with Lt. Roane and eight months before the events culminating in her resignation. As discussed below, Plaintiff presents no fact or evidence from which to reasonably infer that the December incident was connected to later events or impacted her working conditions at the time of her resignation.

---

[12] Plaintiff also argues that *Suders* has changed the "no other choice but to quit" standard previously utilized by the court of appeals. *See* Pl.'s Corrected Resp. Br. [Doc. 37] at 14. The Tenth Circuit has rejected this argument. *See Vann v. Southwestern Bell Tel. Co.*, 179 F. App'x 491, 498 (10th Cir. 2006) (unpublished). Although an unpublished decision is not binding precedent, the Court finds it to be persuasive authority and elects to follow it here, pursuant to Fed. R. App. P. 32.1; 10th Cir. R. 32.1(A).

2. Lt. Roane's Conduct

Plaintiff lists four acts involving Lt. Roane in May and July, 2006. It is not entirely clear whether Plaintiff views Lt. Roane's acts as motivated by discrimination or retaliation or both.

Plaintiff casts as two acts a single incident involving an inmate complaint against Plaintiff: Lt. Roane's investigation of the complaint; and his failure to file a misconduct report against the inmate after determining the complaint was false. Plaintiff contends Lt. Roane made a comment that suggests her gender affected his actions. Accepting this contention as true and viewing this fact in Plaintiff's favor as required by Rule 56, the Court finds Lt. Roane's comment in connection with the inmate report permits a reasonable inference that gender played a role in his decisions to investigate and to take no disciplinary action against the inmate when the accusation proved false.

The other enumerated acts are Lt. Roane's alleged false statement to Plaintiff that she was being investigated regarding contraband papers found in an inmate's cell and his callous response to her complaint about a false rumor suggesting inappropriate conduct with inmates. Gender played no apparent role in these incidents.[13] Although arguably hostile, Plaintiff presents no basis to conclude that Lt. Roane's conduct was gender-based or interfered in any way with her job performance.

Plaintiff similarly presents no basis to conclude Lt. Roane's conduct was retaliatory. To establish retaliatory harassment, Plaintiff must show a causal connection between her protected activity and the alleged hostile conduct or "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1269 (10th Cir. 2005) (internal quotation omitted). In her brief,

---

[13] To the extent Plaintiff attempts to attach a sexual connotation to the alleged rumor, her argument lacks any factual basis in the record. According to her deposition testimony, no one said "exactly what kind of inappropriate relationship they were thinking [she was] having." *See* Mills Dep. 82:2-4.

11

Plaintiff speculates that Lt. Roane "likely knew Plaintiff reported Runnels for gender comments" because the men were friends. *See* Pl.'s Corrected Resp. [Doc. 37] at 8. She does not explain why Lt. Roane would decide to retaliate against her five months later. The time lapse between Plaintiff's complaint against Sgt. Runnells and Lt. Roane's investigation does not support a reasonable inference of retaliatory motive. *See Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) ("a four-month time period does not support an inference of retaliatory motive"). Plaintiff has not shown any logical connection between her complaint against Sgt. Runnells and Lt. Roan's conduct in May, 2006, and any connection to events in July, 2006, is even more tenuous. Thus, the record does not permit a reasonable inference that Lt. Roane engaged in retaliatory harassment.

        3.      Events of August, 2006

Plaintiff lists four acts of harassment in the days leading up to her resignation on August 24, 2006: Cpl. Woods' derogatory words on August 18 in response to Plaintiff's enforcement of the post order requiring separation of male and female inmates; Tracy Jones' angry response on August 24 regarding the same issue; Lt. Roane's alleged violation on August 20 of a written policy regarding employee tape recordings; and Lt. Hamilton's retaliatory manner of investigating Plaintiff's discrimination complaint on August 23 and 24.

Accepting Plaintiff's testimony as true for the purpose of Rule 56, the Court finds that reasonable jurors could clearly find Cpl. Woods engaged in abusive conduct toward Plaintiff based on her race and gender, notwithstanding his denial of using obscenities and calling her a "white bitch." The court of appeals has concluded that while the word "bitch" may be used in a non-sexual context to suggest overbearing behavior, its use to convey a gender-based insult is a permissible inference to be decided by the finder of fact. *See PVNF*, 487 F.3d at 798-99.

Mr. Jones' outburst regarding Plaintiff's enforcement of the post order carries no hint of any gender-based or retaliatory motivation. Plaintiff offers no facts or evidence to show it was related to earlier events in any way. Defendant now concedes, however, that Plaintiff correctly interpreted the post order, despite other employees' disagreement with her position at the time.[14] A reasonable inference could be drawn from the record that Plaintiff became the target of verbal abuse and unfounded threats immediately after she made a discrimination complaint. Further, Maj. Watson provided no assurance that any corrective action would be taken.

Plaintiff's contention that Lt. Roane violated an employee policy regarding tape recordings and retaliated against her by "writing up Plaintiff for asking permission to record a meeting" lacks record support. *See* Pl.'s Corrected Resp. Br. [Doc. 37] at 9. Plaintiff cites only an incident report prepared by Lt. Roane on August 20, 2006, and a written policy regarding employee conduct, the relevance of which is unclear. The report does not appear to be a misconduct write-up but a memorialization of events. It recites the contacts between Plaintiff and Lt. Roane on August 19-20 in which she complained to him about Cpl. Woods, requested a recorded meeting, and then delivered a written complaint. The report indicates that a typed letter delivered by Plaintiff was attached, and in a space for writing comments or indicating the action taken, the report says, "FYI." *See* Pl.'s Corrected Resp. Br., Ex. 5 [Doc. 37-4] at 3. There is simply no indication in the record that Lt. Roane's "FYI" report was an unfounded disciplinary write-up.[15]

---

[14] Mr. Jones' incident report references "a new policy that we can escort female inmates when males are out so long as we are escorting the female." *See* Pl.'s Corrected Resp. Br., Ex. 11 [Doc. 37-7]. Also, another officer on duty with Plaintiff when she refused to admit Cpl. Woods either admitted him or instructed Plaintiff to do so, depending on whose version of events is believed. Plaintiff contends that Lt. Roane and Lt. Hamilton both suggested to her that she should have admitted Cpl. Woods.

[15] Notably, Lt. Roane was not Plaintiff's direct supervisor on the date of his report. *See supra* note 3.

13

Finally, Plaintiff contends that Lt. Hamilton's investigation was itself retaliatory harassment, designed to force Plaintiff's resignation. The record permits a reasonable inference that Lt. Hamilton was unsure of the procedures to be followed and the subject of the investigation. In addition to mistakenly issuing a "cease and desist" order to Plaintiff, Lt. Hamilton notified the parties that she was conducting a "level-one" investigation as provided by a DOC policy regarding allegations of misconduct. *See* Def.'s Mot. Summ. J., Ex. 4-5, 10 [Doc. Nos. 29-5, 29-6 & 29-11].[16] Her report indicates she undertook an investigation directed at Plaintiff's conduct as well as Cpl. Woods. Finally, although Plaintiff resigned before Lt. Hamilton completed the investigation, the final meeting left no doubt what the result would be, if Plaintiff's account of the meeting is accepted. Viewing the alleged facts most favorably to Plaintiff as required by Rule 56, the Court accepts Plaintiff's characterization of Ms. Hamilton's conduct as hostile and motivated by retaliation for Plaintiff's discrimination complaint.

4. Conclusion Regarding Title VII

Turning to the issue of whether the facts and evidence presented by Plaintiff demonstrate a genuine issue of material facts in support of her claim of hostile work environment constructive discharge, the Court finds, although barely, that a reasonable jury could find that Plaintiff was the victim of a hostile or abusive work environment based on her gender and protected conduct. Plaintiff has identified several arguable incidents of gender-based hostility during her nine-month term of employment and increasingly hostile acts after she complained of discrimination. Under the totality-of-circumstances approach, even neutral conduct considered in context can provide evidence

---

[16] Complaints of alleged discrimination are subject to a policy that provided employee grievance resolution procedures. *See id.*, Ex.13 [Doc. 29-14] at 5. Although Plaintiff did not submit a completed grievance form in accordance with this policy, there is no evidence that LARC had identified a grievance manager to receive grievances under the policy.

14

of unlawful harassment. *See O'Shea v. Yellow Tech. Serv., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999); *see also Harsco*, 475 F.3d at 1187; *Chavez*, 397 F.3d at 834-35. Cpl. Woods' alleged verbal abuse of Plaintiff was severely demeaning. Mr. Jones, Maj. Watson, Lt. Roane, and Lt. Hamilton also engaged in conduct that could suggest hostility or abuse. In short, viewing the facts and evidence and all reasonable inferences most favorably to Plaintiff, a rational jury could find that the objective severity of the alleged harassment was sufficient to alter the conditions of Plaintiff's employment and create an abusive working environment. The issue of objective severity is "quintessentially one of fact." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).

Similarly, the constructive discharge issue cannot be resolved as a matter of law on the record presented. Giving Plaintiff the benefit of all favorable evidence and inferences that could be reached by rational jurors, the Court concludes that Plaintiff has made a minimally sufficient showing to raise a genuine dispute as to whether her resignation constituted a constructive discharge. A reasonable jury could find that Defendant created working conditions so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign. Clearly, no person to whom Plaintiff turned on August 24 tried to dissuade her from leaving or offered any assurance that she would be protected from future harassment. Further, jurors could reasonably find that Plaintiff was pressured to resign, that the pressure was motivated by retaliation for her discrimination complaint, and that the pressure had reached a level of severity that a reasonable person in her position would have found intolerable at the time of her resignation. Lacking support of coworkers, supervisors, and management of LARC, Plaintiff might reasonably have perceived a risk to her physical safety and emotional well-being in light of the prison workplace setting. In short, the Court finds this case, like *Suders*, presents genuine issues of material fact concerning the hostile work environment constructive discharge claim.

Therefore, because Plaintiff has demonstrated a genuine dispute of material facts, summary judgment on Plaintiff's Title VII claim is inappropriate.

### E.     Plaintiff's State Law Claim

The parties agree that in light of recent decisions of the Oklahoma Supreme Court, Plaintiff may bring a *Burk* claim in tandem with her Title VII claim.  Although they disagree regarding the proof needed to prevail on Plaintiff's state law claim, Defendant does not disagree that if Plaintiff's Title VII claim survives summary judgment, then her *Burk* claim survives as well.  Therefore, for the reasons stated above, summary judgment on Plaintiff' state law claim is inappropriate.

### Conclusion

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment [Doc. No. 29] is DENIED.

IT IS SO ORDERED this 30th day of   April, 2010.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE